**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | | |
|---|---|---|
| Epson America, Inc. | ) | Civil Action No.  3:18-cv-03134-JMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **PLAINTIFF'S MEMORANDUM OF** |
| | ) | **LAW IN SUPPORT OF ITS MOTION** |
| Curtis International Ltd. and | ) | **FOR PRELIMINARY INJUNCTION** |
| Technicolor SA d/b/a Technicolor USA, | ) | |
| Inc. | ) | |
| | ) | |
| Defendant. | | |

Plaintiff Epson America, Inc. ("Epson") respectfully submits this Memorandum of Law in Support of its Motion for a Preliminary Injunction seeking to prohibit Defendants Curtis International Ltd. ("Curtis") and Technicolor SA d/b/a Technicolor USA, Inc.'s ("RCA," and together with Curtis, "Defendants") from further engaging in unlawful false advertising.

## INTRODUCTION

Curtis and RCA have engaged in an ongoing campaign to purposefully deceive the public by grossly overstating the brightness of their projectors.  Through independent testing, Epson has conclusively established that Curtis' RPJ116 projector, which it advertised as producing 2000 lumens, actually only produces 32 lumens.  Through independent testing, Epson has also conclusively established that Curtis' RPJ129 projector, which it advertised as producing 3100 lumens, actually only produces 190 lumens. And Defendants' latest model, the RPJ136, a projector recently released in February 2019, is advertised as having 2200 lumens.  Epson, through independent testing, has confirmed that the RPJ136 only emits 38 lumens.  Although deceived consumers have made Defendants aware of their grossly inaccurate lumen claims, Defendants refuse to remove their literally false advertisements from the marketplace and

instead, continue to create confusion in the marketplace. Blatantly false advertising of this magnitude calls for swift injunctive relief to protect consumers and to promote fair competition in the projector marketplace.

The Supreme Court recently spoke of the Lanham Act's reliance upon competitors to police and cure false advertising to consumers. The Supreme Court explained:

> Competitors who manufacturer or distribute products have detailed knowledge regarding how consumers rely upon certain sales and marketing strategies. Their awareness of unfair competition practices may be far more immediate and accurate than that of agency rulemakers and regulators…. Lanham Act suits draw upon this market expertise by empowering private parties to sue competitors to protect their interests on a case-by-case basis.

*POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2234 (2014). Accordingly, Epson now seeks to protect its interests as well as those of the consuming public. Epson seeks a preliminary injunction prohibiting Defendants from engaging in further false or misleading advertising with respect to their products' lumen capacities and ordering Defendants to send corrective notice to their retailers and customers to alleviate and mitigate the confusion in the marketplace caused by their false advertising.

In the related case, *Epson Am., Inc. v. USA111, Inc.*, 259 F. Supp. 3d 387 (D.S.C. 2017) (Currie, J.)[1], this Court recently granted Epson's Motion for Preliminary Injunction against another competitor under a nearly identical set of facts. The Court held that Epson met all four requirements for a preliminary injunction and required defendant to revise its online advertisements to reflect the true lumens rating of its projectors. Epson requests the Court to do the same here.

---

[1] For the convenience of the Court, a copy of Judge Currie's ruling is attached as Exhibit A.

# FACTS

The facts set forth in this section are supported by the Verified Complaint (ECF No. 1) ("Compl."), Verified Amended Complaint (ECF No. 22) ("Am. Compl."), the Affidavit if Michael Isgrig (Exhibit B), and the Affidavit of Karl Lang (Exhibit C).

### A.     Portable Consumer Projectors

While traditionally associated with movie theaters, projectors have become an increasingly common video display product for consumers used in home, business, and educational settings.  Compl. ¶ 9, Am. Compl. ¶ 10 .  Today, consumers use digital projectors in the same way as television or computer screens.  Digital projectors receive video signals from external devices, such as DVD players or computers and "project" those signals onto a screen. Compl. ¶ 10, Am. Compl. ¶ 11.  Consumers can purchase projectors in a variety of sizes ranging from the size of a cell phone to larger, permanently-mounted projectors for home theaters. Compl. ¶ 11, Am. Compl. ¶ 12.  Within a particular projector category, such as portable consumer projectors, the quality and corresponding price of a specific projector is largely determined by its resolution and brightness.  Compl. ¶ 12 Am. Compl. ¶ 13.  Projector brightness is typically measured and described in lumens.  Compl. ¶ 13, Am. Compl. ¶ 14.  The brighter the projector, the higher the lumen rating, and, all else being equal, the more it will likely cost. Compl. ¶ 13, Am. Compl. ¶ 4.

The lumen rating for a projector is one of the most important and immediately recognizable projector features for consumers and one that necessarily impacts consumer choice. Compl. ¶ 14, Am. Compl. ¶ 15.  The American National Standards Institute developed and approved an objective standard for measuring the lumen output of projectors, known as the

"ANSI Standard." Compl. ¶ 15, Am. Compl. ¶ 16. The ANSI Standard establishes minimum protocols for measuring and communicating important performance attributes for projectors and is widely used by projector manufacturers to standardize how lumen ratings are communicated to customers. Compl. ¶ 15, Am. Compl. ¶ 16. For this reason, lumen ratings are used to create sub-groups of portable consumer projectors, and serve as a measuring stick for consumers to compare projectors. *See infra* Sec. I.A.3. Due to the importance of a projector's brightness levels, manufacturers prominently display and advertise a projector's lumen rating on its packaging and advertising. *See* Compl. ¶¶ 24-40.

### B.    Epson Projectors

Epson is recognized throughout the world and the United States as a leading projector manufacturer. Compl. ¶ 16, Am. Compl. ¶ 18. As a market leader, Epson continues to set standards for image quality, performance, and innovation with its line of multimedia projectors. Compl. ¶ 17, Am. Compl. ¶ 19. Epson's commitment to delivering quality products is recognized by the industry through various product awards and industry recognition. Compl. ¶ 17, Am. Compl. ¶ 19. Epson has spent millions of dollars and significant time and effort in advertising, promoting, and developing its brand and establishing substantial goodwill in the portable consumer projector market. *See generally* Compl. ¶¶ 16-17. Epson prides itself on achieving the highest customer satisfaction ratings, accomplished in large part by using the most precise testing equipment and procedures available to ensure accurate product descriptions and specifications. Compl. ¶ 18, Am. Compl. ¶ 20. In addition, Epson's projector service and support is industry-leading. Compl. ¶ 19, Am. Compl. ¶21. Epson offers its projectors with a two-year standard limited warranty, including Epson's Road Service, which provides a replacement projector with next day delivery and free shipping. Compl. ¶ 19, Am. Compl. ¶ 21.

### C.     Defendants' False Advertising of Their Projectors

#### 1.     *Defendants' Projectors*

Defendants are a direct competitor of Epson in the portable consumer projector market. Compl. ¶ 20, Am. Compl. ¶ 22.  Defendants sell and offer for sale projectors to consumers throughout the United States on various online commerce sites including, but not limited to, Amazon.com and Walmart.com, as well as various brick and mortar retail stores.  Compl. ¶ 20, Am. Compl. ¶ 22.  Defendants sell their projectors under various brand names, including, but not limited to, "RCA."  Compl. ¶ 21, Am. Compl. ¶ 23.  Defendants supply their projectors to other companies under different brand names.  Compl. ¶ 21, Am. Compl. ¶ 23.  The Curtis/RCA RPJ116 projector, advertised as projecting 2000 lumens, is a top-selling Curtis projector. Compl. ¶ 22, Am. Compl. ¶24.  Curtis/RCA sell several other projectors, including the RPJ129, which it advertises has a lumen rating of 3100.  Compl. ¶ 30, Am. Compl. ¶ 31.

#### 2.     *Defendants' Launch of the RPJ136 Projector*

After this lawsuit was filed, counsel for the parties engaged in extensive settlement discussions beginning in December 2018.  *See* ECF 13, 16, 18, 20 (four motions by the parties to extend deadlines to allow for settlement discussions).  While settlement negotiations were ongoing, on February 28, 2019, Epson learned that Defendants launched a new projector at Walmart — the Curtis/RCA RPJ136.  Am. Compl. ¶ 37.  As follows is a picture of the newly launched RPJ136 and how it is displayed to Walmart customers:

5



Am. Compl. 38.  As shown from the picture, the Curtis/RCA RPJ136 is advertised as a "Super Bright" 2200 lumens projector.

### 3.  *Independent Testing*

Epson commissioned Lumita, Inc. ("Lumita"), an independent technology consulting company that specializes in product testing involving light and color measurement, to test the actual brightness of Defendants' projectors.  Ex. C.  Lumita tested the RPJ116 projector, which Defendants represent as having a 2000 lumen rating.  Compl. ¶ 22.  The results showed that the projector actually has a 32 lumen output, which is nearly 98 percent less than Defendants' advertised rating.  Ex. C at ¶ 13.  Accordingly, the RPJ116's actual light output is materially smaller than the 2000 lumens Defendants represent to consumers in their advertising and product description.  Ex. C at ¶ 20.  Lumita also tested the RPJ129 projector.  While Defendants represent that the RPJ129 has a 3100 lumen rating, Lumita's testing revealed that each projector actually has a 190 lumen output, which is nearly 93 percent less than Defendants' advertised rating.  Compl. ¶ 30; Ex. C at ¶ 12. Accordingly, the actual light output of the RPJ129 is materially smaller than the 3100 lumens Defendants represent to consumers in their advertising

and product description. Ex. C at ¶ 20. While Defendants represent that the RPJ136 has a 2200 lumen rating, Lumita's testing revealed that the projector actually has a 38 lumen output, which is nearly 98 percent less than Defendants' advertised rating. Am. Compl. ¶ 42; Ex. C at ¶ 14. Accordingly, the actual light output of the RPJ136 is materially smaller than the 2200 lumens Defendants represent to consumers in their advertising and product description. Ex. C at ¶ 20.

### 4.    *Defendants Deceive Consumers*

Beyond the independent testing, which conclusively establishes that Defendants' lumen representations are literally false, purchasers of Defendants' projectors throughout the United States have voiced serious concerns regarding Defendants' projector brightness representations, in many cases calling Defendants' claims wholly false and unsupported. Compl. ¶ 25, Am. Compl. ¶ 28. For example, customer feedback for Defendants' projectors on Walmart.com contains, *inter alia*, the following comments:

- "It says 2000 lumens, but I suspect the one I took home was barely 1000. Even in a dark room, it missed the mark. I thought it was a little too good to be true…"

- "The ones that rated high are completely incorrect…. This product all together is horrible. Horrible picture quality, color, brightness!"

- "The packaging shows the projector being used in bright light, but you'd better have pitch dark to use this. I immediately returned it."

Compl. ¶ 25, Am. Compl. ¶ 28.

Purchasers of Defendants' projectors are likely to be, and actually have been, misled and deceived by Defendants' product labels, descriptions, names, and advertisements. Compl. ¶ 34. Consumers expect the represented brightness specifications to be accurate for Defendants' projectors, as they base their purchasing decisions in large part on these representations. Compl. ¶ 34. In fact, consumers that purchase Defendants' projectors receive projectors with drastically

lower brightness outputs than those represented and advertised by Defendants.  Compl. ¶ 34; Ex. C at ¶ 20.

     **5.**     ***Defendants' False Advertising Harms Epson***

Defendants' false and misleading product labels, descriptions, and advertisements are damaging to Epson's reputation and goodwill and are also damaging to the consuming public. Compl. ¶ 35.  These false and misleading representations are designed to entice consumers to purchase Defendants' projectors over Epson's products.  Compl. ¶ 35.  Specifically, Defendants' false representations regarding the lumen outputs for their projectors suggest that consumers can purchase Defendants' projectors with comparable brightness levels to Epson projectors, when actually, Defendants' projectors have materially lower brightness levels.  Compl. ¶¶ 27, 32; Ex. B at ¶ 20.

Furthermore, due to Defendants' literally false advertising, customers who have poor experiences with Curtis' RPJ116, RPJ129, or RPJ136 projectors believing them to be 2000 lumen, 3100 lumen, or 2200 lumen projectors respectively are less likely to purchase a ***true*** 2000 lumen, 3100 lumen, or 2200 lumen projectors as they will unknowingly believe that Curtis' 32, 190, and 38 lumen projectors are representative of 2000, 3100, 2200 lumen projectors.  Compl. ¶¶ 37-38.  In fact, there is already evidence of this occurring in the marketplace as a Walmart customer left the following feedback on the Curtis/RCA RJP116 projector[2]:

---

[2] WALMART.COM, https://www.walmart.com/reviews/product/178900908 (last visited Mar. 21, 2019) (sort "Customer Reviews" by "Newest to oldest").

Because users of Defendants' projectors leave their experience thinking that "2K lumens is not strong enough" when in reality they were using a projector with 32 lumens, the entire projector industry is harmed as that consumer likely believes he/she needs a far higher lumen projector to meet his/her brightness needs.   As projectors' prices increase with their lumen levels, this customer may eschew the entire projector market, believing himself or herself to be priced out of such a product.  This, in turn, hinders Epson's ability to promote or sell its projectors with true lumen ratings.  Compl.  ¶¶ 37-38.  Defendants' false advertisements, therefore, harm Epson (and each projector manufacturer or retailer that correctly advertises lumens) in its promotion and sale of projectors.  Compl. ¶¶ 37-39.

The natural, probable, and foreseeable result of Defendants' wrongful conduct has been to cause confusion, deception, and mistake in the portable consumer projector market as a whole, to deprive Epson of business and goodwill, and to injure Epson's relationship with existing and prospective customers.   Compl. ¶¶ 37-38.   Epson is informed and believes that Defendants' wrongful conduct has resulted in increased sales of Defendants' projectors while hindering the sales of Epson's projectors, as well as its ability to properly promote and advertise its products.  Compl. ¶ 39.  Epson has sustained and will continue to sustain irreparable damages as a result of Curtis' wrongful conduct, unless enjoined.  Compl. ¶ 39.

## ARGUMENT

In order to obtain a preliminary injunction, a plaintiff must show:

    (1) likelihood it will succeed on the merits;

    (2) likelihood it will suffer irreparable harm in the absence of a preliminary injunction;

    (3) that the balance of equities tips in its favor; and

    (4) that the injunction is in the public interest.

*Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *Real Truth About Obama v. FEC*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010); *Occupy Columbia v. Haley*, 866 F. Supp. 2d 545, 552 (D.S.C. 2011); *Klockner-Humboldt-Deutz Aktiengesellschaft, Koln v. Hewitt-Robins Div. of Litton Sys., Inc.*, 486 F. Supp. 283, 287 (D.S.C. 1978) (granting preliminary injunction on false advertising claim); *see also Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, No. 116CV592JCCMSN, 2016 WL 3348431, at *13 (E.D. Va. June 15, 2016) (granting a preliminary injunction on false advertising claim); *Scotts Co. v. Pursell Indus., Inc.*, No. 3:02CV240, 2002 WL 34528439, at *4 (E.D. Va. July 2, 2002) (granting a preliminary injunction on false advertising claim).

## I.     EPSON IS LIKELY TO SUCCEED ON ITS CLAIMS

The first question is whether Epson is likely to succeed on the merits. *Winter*, 555 U.S. at 20. Epson need not establish "actual success" — only a "likelihood of success" at trial. *Amoco Production Co. v. Gambell*, 480 U.S. 531, 546 n.12 (1987); *accord Parents' League for Effective Autism Servs. v. Jones-Kelley*, 339 F. App'x 542, 547 (6th Cir. 2009) ("At this stage of the litigation, we are not deciding that plaintiffs will succeed in showing a violation of their rights . . . but only [whether the plaintiff was entitled to] preliminary injunctive relief."); *Caballo Coal Co. v. Indiana Michigan Power Co.*, 305 F.3d 796, 802 (8th Cir. 2002) ("It is

important to note that in this instance, as in any preliminary injunction analysis, the court does not predetermine the merits of the case.").

### A.    <u>Epson's False Advertisement Claim Is Likely To Succeed On The Merits</u>[3]

The Lanham Act prohibits the "false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B); *see PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 120 (4th Cir. 2011). In order to assert a false advertising claim under the Lanham Act, a plaintiff must establish that:

> (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product;
>
> (2) the misrepresentation is material, in that it is likely to influence the purchasing decision;
>
> (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience;
>
> (4) the defendant placed the false or misleading statement in interstate commerce; and
>
> (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

*Design Res., Inc. v. Leather Indus. Of Am.*, 789 F.3d 495, 501 (4th Cir. 2015) (quoting *PBM Prods.*, 639 F.3d at 120).

Epson easily satisfies each element.

---

[3] Epson only moves for injunctive relief under the Lanham Act for false advertising (Count I) as injunctive relief is not available under Epson's state law claim (Count II). *See Epson Am., Inc. v. USA111, Inc.*, 259 F. Supp. 3d at 391 n. 2.

1.     ***Defendants Have Made Literally False Statements Regarding Characteristics Of Their Projectors***

In a false advertising action under the Lanham Act, "the contested statement or representation must be either false on its face or, although literally true, likely to mislead and to confuse consumers given the merchandising context." *PBM Prod.*, 639 F.3d at 120 (quoting *C.B. Fleet Co. v. SmithKline Beecham Consumer Healthcare, L.P.*, 131 F.3d 430, 434 (4th Cir. 1997)). "In analyzing whether an advertisement . . . is literally false, a court must determine, first, the unambiguous claims made by the advertisement . . . and second, whether those claims are false." *Id.* (citations and internal quotations marks omitted).

Here, Defendants have grossly misrepresented the lumen outputs of their projectors; a factual, measurable characteristic. Because the ANSI Standard is the widely accepted uniform standard for communicating lumen ratings to consumers, by advertising its RPJ116, RPJ129 and RPJ136 projectors as having 2000 lumens, 3100 lumens, and 2200 lumens respectively, Defendants state to consumers that their projectors have corresponding performance attributes measured on the ANSI Standard. *See* Compl. ¶ 15. The product description for Defendants' projectors represents lumen ratings to consumers using the ANSI Standard:

| Product Key Features | |
| --- | --- |
| Non-Domestic Product | No |
| Model | RPJ116 |
| Throw Ratio | Medium/Standard Throw |
| Video Inputs | HDMI, USB, VGA D-Sub |
| Image Aspect Ratio | 16:9 |
| Features | Portable, Built-In Speakers, Table Top Projection, Ceiling Projection |
| Custom Bundle | No |
| Controller | Universal Remote Control |
| Contrast Ratio | 800:1 |
| Audio Outputs | Headphone Jack, Speaker(s), Headphone |
| Connections | HDMI |
| Connectivity | Wired |
| 3D Capability | 2D Only |
| Image Brightness | 2000 ANSI Lumens |
| Resolution | 1080p |
| Modified Item | No |
| Display Technology | LED |
| Native Resolution | 1920x1080 |
| **Dimensions** | |
| Weight | 309 Hundredths Pounds |

[4]

Defendants' representations are false on their face. *See Epson Am., Inc. v. USA111, Inc.*, 259 F. Supp. 3d at 392. Independent testing obtained by Epson shows that Defendants' RPJ116, RPJ129, and RPJ136 projectors produce no greater than 32, 190, and 38 lumens, respectively, a value materially less than the 2000, 3100, and 2200 lumen values represented by Defendants. *See* Ex. B. Thus, Epson has demonstrated that Defendants' claims regarding their projectors are unambiguously and literally false. This is sufficient at this stage of the proceedings, when the Court's only inquiry is whether there is a likelihood of success on the merits.

### 2. *Because Defendants' Claims Are Literally False, Epson Is Not Required to Establish Consumer Deception*

Having demonstrated that Defendants have made literally false representations of fact that influence consumer purchasing, Epson need not demonstrate actual consumer deception in order to obtain injunctive relief. *See In re GNC Corp.,* 789 F.3d 505, 514 (4th Cir. 2015) ("[A] plaintiff arguing literal falsity need not produce such evidence. If a representation is false, we

---

[4] EBAY.COM, https://www.ebay.com/p/RCA-RPJ116-1080p-LED-Projector/4010347831 (last visited Mar. 21, 2019) (follow "About this product" and "Show More" drop-down link).

assume as a matter of law that it is also misleading."); *C.B. Fleet Co.*, 131 F.3d at 434 ("If the advertising claim is literally false, the court may enjoin the use of the claim without reference to the advertisement's impact on the buying public."); *see also McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir. 1991) (where advertisement is literally false, "the court may enjoin the use of the claim without reference to the advertisement's impact on the buying public" (internal quotations omitted)); *Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 33 (1st Cir. 2000) ("If the advertisement is literally false, the court may grant relief without considering evidence of consumer reaction.").

Even though it is not required to do so, Epson can easily demonstrate consumer confusion with regard to Defendants' literally false lumen claims. Even a cursory review of the negative customer feedback quickly and conclusively demonstrates that Defendants' consumers are being duped. *See* Compl. ¶ 25.

### 3. *Defendants' False Statements Are Material*

False statements about lumen output are material as they are "likely to influence the purchasing decision." *See Epson Am., Inc. v. USA111, Inc.*, 259 F. Supp. 3d at 393 (quoting *Design Res.*, 789 F.3d at 501). As held by Judge Currie in *Epson Am., Inc. v. USA111, Inc.*, projector brightness is a material characteristic, as consumers readily identify projectors based upon this measurement. *Id.* It is one of the most important characteristics informing consumer choice when selecting a portable projector. Compl. ¶ 34. For this reason, manufacturers prominently display the brightness in lumens for projectors on product packaging and in product descriptions, labels, names, and advertising. *See* Compl. ¶¶ 23, 29. Indeed, knowing the importance of lumens to consumers, Defendants frequently places lumen ratings on the front of their product packaging. *See, e.g.*, Compl. ¶¶ 23, 29.

In representing projector lumen outputs that are significantly higher than actual outputs, Defendants literally misrepresent material, factual information to consumers. As an indication of the importance of lumen outputs to consumers, Defendants have included advertised lumen ratings directly in their product packaging for the majority of their portable consumer projectors. *See* Compl. ¶¶ 23, 29. As a further indication of the importance of brightness to consumers, customers can view and compare similar projectors on Amazon.com by lumen output and search amongst available projectors by "Video Projector Image Brightness," which lists several different lumen ranges:



[5] AMAZON.COM, https://www.amazon.com/Epson-Cinema-1080p-Theater-Projector/dp/B014D7XHDC/ref=sr_1_fkmr0_1?keywords=epson+home+cinema+2040+1080p+3ds+lcd+home+theater+projector&qid=1553175703&s=gateway&sr=8-1-fkmr0 (last visited Mar. 21, 2019) (products listed under "Compare with similar items" section of webpage).

Lastly, the negative feedback left by consumers concerning Defendants' false lumen claims again demonstrates that lumens are a quality in projectors that consumers deem important. *See* Compl. ¶ 25. Defendants' false lumen claims were so important to these duped consumers that they took the time to log into their Walmart accounts and write negative reviews warning other consumers of Defendants' false lumen claims. Given all of the above, there is no doubt that statements regarding lumens are material to purchasers of projectors.

### 4. *Defendants' Claims Were Made In Interstate Commerce*

The Lanham Act defines "commerce" as "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127; *see also Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco*, 329 F.3d 359, 363 (4th Cir. 2003) ("commerce" under the Lanham Act is coterminous with the commerce that Congress may regulate under the Commerce Clause of the United States Constitution). Indeed, courts have had little trouble considering the internet an "instrumentality of interstate commerce." *Epson Am., Inc. v. USA111, Inc.*, 259 F. Supp. 3d at 394; *AvePoint, Inc. v. Power Tools, Inc.*, 981 F. Supp. 2d 496, 512 (W.D. Va. 2013); *Verisign, Inc. v. XYZ.com, LLC*, 2015 WL 7430016, at *4 (E.D. Va. Nov. 20, 2015). It is undisputed that in selling and advertising their projectors to consumers throughout the United States through various online marketplaces including Amazon.com and Walmart.com, Defendants' false representations have been made in interstate commerce, thus satisfying the fourth element of the Lanham Act analysis.

### 5. *Epson Has Been And Will Continue To Be Injured By Defendants' False Advertisements*

---

[6] AMAZON.COM, https://www.amazon.com/s?k=home+theater+projectors&ref=nb_sb_noss_2 (last visited Mar. 21, 2019) (listed as filter option on left-hand sidebar).

To satisfy the final element of a false advertising claim under the Lanham Act, Epson must show that it has been or is likely to be injured as a result of the misrepresentation, either by diversion of sales or by a lessening of goodwill associated with its products. *See PBM Prod.*, 639 F.3d at 120. This element of a Lanham Act claim necessarily overlaps with the irreparable harm analysis, and is thus addressed in the following section.

## II. EPSON WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF A PRELIMINARY INJUNCTION

The plaintiff must "make a clear showing that it is likely to be irreparably harmed absent preliminary relief." *Real Truth About Obama, Inc.*, 575 F.3d at 347. "[G]enerally irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate." *MultiChannel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994). Moreover, "the Fourth Circuit Standard clearly allows injunctive relief even if money damages are available, if a remedy at law is inadequate." *Epson Am., Inc. v. USA111, Inc.*, 259 F. Supp. 3d at 394. "When the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." *MultiChannel TV Cable*, 22 F.3d at 552. Because claims under the Lanham Act involve injury to reputation and goodwill, the Fourth Circuit recognizes that it is almost impossible to prove the extent of harm. *See PBM Prod.*, 639 F. 3d at 126 ("It is virtually impossible to prove that so much of one's sales will be lost or that one's goodwill will be damaged as a direct result of a competitor's advertisement.") (citation omitted); *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 939 (4th Cir. 1995) ("Infringement gives rise to irreparable injury, in that plaintiff has lost control of its business reputation to this extent, there is substantial likelihood of confusion of the purchasing public,

there may be no monetary recovery available, and there is an inherent injury to the good will and reputation of the plaintiff." (internal quotation marks and citation omitted)).

For this reason, the Fourth Circuit has made clear that the irreparable harm element is satisfied and injunctive relief is proper when a plaintiff "suffers from irreparable harm based primarily on the fact that [defendant's] advertising misled customers." *See PBM Prod.,* 639 F.3d at 126; *see also Black & Decker (U.S.) Inc. v. Pro-Tech Power Inc.*, 26 F. Supp. 2d 834, 861 (E.D. Va. 1988) ("[T]the irreparable harm prong can be satisfied upon a demonstration that the competitor's advertising tends to mislead consumers."). Further, a Lanham Act plaintiff can demonstrate irreparable harm through lost sales in order to obtain an injunction "even if most of [the] sales decline is attributable to factors other than the competitor's false advertising." *See PBM Prod.*, 639 F.3d at 126, 127 (citing *Coca-Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 316 (2d Cir. 1982)).

Epson has satisfied the Fourth Circuit's test for demonstrating irreparable harm as absent injunctive relief, Epson has no means to prevent Defendants from "infecting the marketplace" with false statements. *See Epson Am., Inc. v. USA111, Inc.*, 259 F. Supp. 3d at 394 ("money damages would not prevent iRULU from 'infecting the marketplace with the same or similar claims in different advertisements in the future'" (quoting *PBM Prod.*, 639 F.3d at 127)). Indeed, it is undisputed that Defendants compete directly with Epson in the portable consumer projector market. While literally false statements regarding material product characteristics are misleading as a matter of law, customer feedback unequivocally shows that Defendants' false statements regarding its projectors' brightness levels have misled consumers into purchasing their projectors. *See* Compl. ¶ 25; *PBM Prod.*, 639 F.3d at 126. This proof of consumer deception alone is sufficient for a showing of irreparable harm. *See PBM Prod.,* 639 F. 3d at 126

(holding irreparable harm element satisfied "primarily on the fact that [defendant's] advertising misled customers.").

Moreover, Defendants' conduct irreparably harms the entire projector market as Defendants' false lumen rating advertisements hinder the ability of Epson and other projector manufacturers to promote projectors with accurate lumen ratings. *See* Compl. ¶¶ 37-39. After being misled by Defendants' literally false lumen ratings for the RPJ116, RPJ129 and RPJ136 projectors, the consuming public is less likely to purchase a projector with a ***true*** 2000, 3100, or 2200 lumen rating as consumers will unknowingly believe that Curtis' 32, 190, and 38 lumen projectors are representative of the performance of a 2000, 3100, and 2200 lumen projector respectively. Compl. ¶¶ 37-38. Indeed, this is not speculation or conjecture on the part of Epson. Even at this early stage of the litigation, there is already evidence of actual consumer confusion on this point. As stated *supra*, as follows is feedback from a Walmart customer who purchased Defendants' RPJ116 projector:



This potential for permanent loss of goodwill likewise easily satisfies the irreparable harm prong of the analysis for a preliminary injunction. *See MultiChannel TV Cable*, 22 F.3d at 552

Finally, Epson has set forth evidence that its sales have declined. In fact, data suggest that Defendants swiftly captured an average of 34% of the market due to their false advertising

tactics, and Epson estimates that it has lost approximately $10 million in projector sales in 2018 and projects that it will lose another $10 million in 2019.  Ex. B, ¶¶ 12-15.  This evidence alone is also sufficient to satisfy the irreparable harm element.  *PBM Prod.*, 639 F.3d at 126, 127.

## III.   THE BALANCE OF EQUITIES FAVORS EPSON; A PRELIMINARY INJUNCTION WOULD NOT UNDULY HARM DEFENDANTS

The third injunctive element, the balance of equities, tilts heavily in favor of Epson.  As shown, Epson has invested millions of dollars and significant time and effort in advertising, promoting and developing its brand within the portable consumer projector market without the use of false advertising.  Defendants, on the other hand, have been proven to make wildly false claims about their products' lumens in an effort to increase their sales.  Defendants have no equitable interest in perpetuating false claims regarding material characteristics of their products. *See PBM Prod.*, 639 F. 3d at 127.  Even if the harm to Defendants in ceasing their unlawful conduct were relevant (it is not),[7] the injunction here would not cause Defendants any *undue* harm.  In falsely advertising its products, Defendants are solely responsible for any harm that may result from an injunction that calls for Defendants to stop deceiving the consuming public.  Further, whatever the costs of an injunction, Defendants are "largely to blame for those costs." *Tecnimed SRL v. Kidz-Med, Inc.*, 763 F. Supp. 2d 395, 414 (S.D.N.Y. 2011), *aff'd*, 462 F. App'x 31 (2d Cir. 2012) (granting preliminary injunction in action under the Lanham Act).  Thus, the equities strongly tip in favor of granting an injunction.

---

[7] As the Fourth Circuit has recognized, the previous "balance-of-hardship test" for preliminary relief "may no longer be applied in granting or denying preliminary injunctions in the Fourth Circuit," because that test was "in fatal tension" with more recent Supreme Court authority. *Real Truth About Obama.*, 575 F.3d at 346 (discussing *Winter*, 555 U.S. 7).

## IV.     THE PUBLIC INTEREST WOULD BE ENHANCED BY A PRELIMINARY INJUNCTION

Fourth Circuit case law makes clear that there is a strong public interest in ridding the marketplace of false advertising.   "[I]t is self evident that preventing false or misleading advertising is in the public interest in general."   *PBM Prod.,* 639 F. 3d at 127 (citations omitted); *Scotts*, 315 F.3d at 286 (same); *Choice Hotels Int'l, Inc. v. Zeal, LLC*, No. 13-1961, 2015 WL 5781507, at *13 (D.S.C. Sept. 29, 2015) (same).   Indeed, the Supreme Court has made clear that the Lanham Act relies on competing manufacturers to rid their marketplaces of false advertising through private suits such as this.  *POM Wonderful LLC*, 134 S. Ct. at 2234.

There is no question that false advertising is likely to deceive the consuming public. Where, as here, the defendant makes literally false representations, the consuming public *is* deceived.   Defendants' false statements have led consumers to believe that they can purchase a projector with a certain brightness rating for a fraction of the cost of a competing projector.  *See* Compl. ¶ 25.   The public interest is best served by ensuring manufacturers accurately represent their products.   Accordingly, the Court should enjoin Defendants from making further false statements and further order that Defendants provide the consuming public with accurate information.

## V.     THE COURT SHOULD REQUIRE DEFENDANTS TO ISSUE CORRECTIVE NOTICES

Courts may additionally require a defendant to issue corrective notices and place advertising as necessary to cure the misperception in the marketplace that its false statements created. *See, e.g., Epson Am., Inc. v. USA111, Inc.*, 259 F. Supp. 3d at 395, *Linotype Co. v. Varityper, Inc.*, 1989 WL 94338 (S.D.N.Y. Aug. 4, 1989) (requiring corrective advertising in preliminary injunction on false advertising claim).   Given the confusion that Defendants' false advertising has caused and will continue to cause in the marketplace, not only is an injunction

necessary, but some type of corrective advertising is also required to remedy the false information that is still communicated to consumers. *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 264 (2d Cir. 2014) (upholding the district court's order of corrective advertising that required the defendant to publish in a trade magazine and post an explanation on its webpage of the differences between the parties' chemical products used in vitamins and nutritional supplements); *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 971 (D.C. Cir. 1990) (noting that the district court ordered competing dog food companies to send corrective advertisements to customers that had previously received false advertisements, which was not challenged on appeal). Even if Defendants attempts to remove any lumen rating from their product titles and product specifications, residual references to false lumen ratings will remain on third-party websites and customer reviews. Such consumer confusion will only be cured by an affirmative statement by Defendants actively putting forth *correct* information into the marketplace.

Accordingly, Curtis should be required to issue corrective notices as well as a public press release. The corrective notices would take the form of a letter to its retailers. The press release would be a general statement posted on its website to consumers. Each communication would provide the true ANSI lumen ratings for each of Defendants' projectors. The harm in doing so amounts to little more than an inconvenience for Defendants and is far outweighed by the benefit of attempting to remedy the confusion that Defendants have undoubtedly caused in the marketplace.

## RELIEF REQUESTED

For these reasons set forth above, Epson respectfully requests that its Motion for Preliminary Injunction be granted: (1) prohibiting Defendants and their subsidiaries, retailers, distributors, and any other person or entity acting in concert or participation with Defendants

from engaging in further false or misleading advertising with respect to their products' lumen capacities; (2) ordering Defendants to send corrective notice to their retailers and issue a press release to their customers disclosing their products' true ANSI lumen capacities and for whatever other relief this Court deems just and equitable.

[*SIGNATURE PAGE FOLLOWS*]

Charleston, South Carolina      /s/ *Christopher A. Jaros*
Dated:  March 22, 2019

Christopher A. Jaros (Federal ID# 12094)
E-Mail:  christopher.jaros@klgates.com
Jeffrey S. Patterson (Federal ID# 9414)
E-Mail: jeffrey.patterson@klgates.com
Morgan T. Nickerson (*admitted pro hac vice*)
E-Mail:  morgan.nickerson@klgates.com
Jack S. Brodsky (*to be admitted pro hac vice*)
E-Mail:  jack.brodsky@klgates.com
K&L GATES LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Telephone:  617.261.3100
Facsimile:  617.261.3175

ATTORNEYS FOR PLAINTIFF EPSON
AMERICA, INC.

## CERTIFICATE OF SERVICE

    I, Christopher A. Jaros, hereby certify that on March 22, 2019, this document, filed through the ECF system, will be sent electronically to Curtis International Ltd. as identified on the Notice of Electronic Filing, and will be sent to Technicolor SA d/b/a Technicolor USA, Inc. via certified mail to its registered agent's address.

/s/ *Christopher A. Jaros*
Christopher A. Jaros

# EXHIBIT A

259 F.Supp.3d 387
United States District Court, D. South Carolina, Rock Hill Division.

EPSON AMERICA, INC., Plaintiff,

v.

USA111, INC., d/b/a iRULU, Defendant.

CA No. 0:17–cv–00129–CMC
|
Signed 04/26/2017

### Synopsis

**Background:** Consumer projector manufacturer brought action against competitor, alleging that it made false advertisements regarding its projectors' lumen output, in violation of the Lanham Act. Manufacturer moved for preliminary injunction preventing competitor from making further false advertising claims about its projectors and ordering competitor to remove all infringing products from online marketplace until it could substantiate any new proposed lumen claims through appropriate testing.

**Holdings:** The District Court, Cameron McGowan Currie, Cameron McGowan Currie, Senior District Judge, held that:

manufacturer demonstrated that competitor made false claims that overstated projectors' lumen output, as required to succeed on merits of its Lanham Act claim;

competitor's statements were material, as required for manufacturer to succeed on merits of its Lanham Act claim;

competitor placed its alleged false advertisements in interstate commerce, as required for manufacturer to succeed on merits of its Lanham Act claim;

manufacturer demonstrated that it suffered irreparable harm as result of competitor's allegedly false advertisements;

balance of equities weighed in favor of granting preliminary injunction; and

strong public interest in preventing false or misleading advertisements favored granting preliminary injunction.

Motion granted.

### Attorneys and Law Firms

**\*389** Christopher Austin Jaros, K & L Gates, Charleston, SC, Jeffrey Stuart Patterson, Morgan T. Nickerson, Pro Hac Vice, K and L Gates, Boston, MA, for Plaintiff.

**\*390** Clarence Davis, James Mixon Griffin, Margaret Nicole Fox, Griffin and Davis, Columbia, SC, Vladimir P. Belo, Pro Hac Vice, Dinsmore and Shohl LLP, Columbus, OH, for Defendant.

Opinion and Order Granting Motion for Preliminary Injunction

CAMERON MCGOWAN CURRIE, Senior United States District Judge

On January 17, 2017, Plaintiff Epson America, Inc. ("Epson") filed a Complaint alleging Defendant USA111, Inc., d/b/ a iRULU ("iRULU") made false statements in advertising its consumer projectors, specifically a model called the BL20. Epson seeks, inter alia, injunctive relief restraining iRULU from engaging in false advertising and ordering removal of false advertisements from iRULU's projector product listings. Entry No. 1, Compl. ¶ 44. The central allegation is iRULU's claimed lumen rating is vastly overstated in advertisements and has resulted in injury to Epson. *Id.* at ¶¶ 27– 28, 35.

On January 19, 2017, Epson filed a motion for preliminary injunction asking the court to enjoin iRULU from engaging in further false advertising regarding its products' lumen rating, order removal of all infringing iRULU products from Amazon.com ("Amazon") and other websites until iRULU can substantiate any new proposed lumen claims through appropriate testing, and order iRULU to send corrective notices to retailers and customers disclosing the prior false claims regarding the projectors' lumen output. ECF No. 9. For the reasons stated below, the motion for preliminary injunctive relief is granted as to some but not all of the relief requested.

## BACKGROUND

It is undisputed Epson and iRULU both sell portable consumer projectors online through websites such as Amazon. [1] Quality and price for such projectors are largely determined based on the resolution and brightness of the projector. ECF No. 9–2 ¶ 5. Projector brightness is measured and described in lumens, and lumen ratings are often listed in the projector's description or specifications on sites such as Amazon. *Id.* at ¶ 6–8. Some product listings include lumen ratings in the product name itself. *Id.* at ¶ 8. Such ratings are an important piece of information used by consumers when selecting a projector appropriate for their needs. *Id.* at ¶ 7.

Many online marketplaces, such as Amazon, identify best-selling products with a "best seller" or similar label. *Id.* at ¶ 10. These products are often at the top of the results when consumers run searches, which can influence customer selection. Compl. ¶ 36.

iRULU sells approximately 30 different models of projector with advertised lumen ratings between 800 to 2800 lumens. ECF No. 28–2 ¶ 4; ECF No. 1–3. One such projector is the BL20, advertised on Amazon and other online retailers as having 2600 lumens. Compl. ¶ 21, Answer ¶ 21. The BL20 was designated as an Amazon "Best Seller" in the Fall of 2016, although it currently does not hold that designation. ECF No. 28–2, ¶ 18.

Epson manufactures and sells many electronic devices, including projectors which fall into the same category as the BL20. ECF No. 9–2 ¶ 3. In July of 2016, Epson commissioned an independent technology consulting company to test the brightness of iRULU's BL20 projector.  **\*391**  ECF No. 9–3 ¶ 6. The results showed each projector tested had lumen output of approximately 80 lumens instead of the 2600 advertised. *Id.* at ¶¶ 7, 10–14.

Epson filed suit in this court on January 17, 2017, seeking injunctive relief and damages against iRULU. ECF No. 1. Epson requested iRULU be enjoined from falsely advertising its projectors' lumen ratings, and the court order iRULU to remove all false advertisements of the BL20 and all misrepresented iRULU products. *Id.* at ¶ 44. On January 19, 2017, Epson filed a motion for preliminary injunction pursuant to Federal Rule of Civil Procedure 65. [2] ECF No. 9. iRULU filed a response in opposition on March 1, 2017. ECF No. 28. Epson filed its reply on March 8, 2017. ECF No. 30. The

parties declined an evidentiary hearing after agreeing the issues before the court consist of legal claims and inferences to be drawn from the facts submitted in their respective briefs.

## STANDARD

A preliminary injunction is "an extraordinary remedy ... which is to be applied only in [the] limited circumstances which clearly demand it." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991) (internal quotation marks omitted) (citation omitted). The traditional purpose of a preliminary injunction is to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003). To qualify for injunctive relief, a plaintiff must show (1) likelihood it will succeed on the merits; (2) likelihood it will suffer irreparable harm in the absence of a preliminary injunction; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest. *Winter v. NRDC, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); *Real Truth About Obama v. FEC*, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089, 130 S.Ct. 2371, 176 L.Ed.2d 764 (2010).

The *Winter–Real Truth* standard requires the party seeking the injunction to make a "clear showing" it is likely to succeed on the merits. *Real Truth*, 575 F.3d at 345; *see also Winter*, 555 U.S. at 22, 129 S.Ct. 365. This standard compels the moving party to show it is likely to prevail. Regardless of the balance of hardships, it is insufficient for the party to show only "grave or serious questions are presented" in the litigation. *Compare Real Truth*, 575 F.3d at 346 *with Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co.*, 550 F.2d 189, 196 (4th Cir. 1977).

Second, the moving party must make a clear showing it is likely to be irreparably harmed if preliminary relief is denied. To meet this test, the party must show more than a mere possibility of harm. *Winter*, 555 U.S. at 21, 129 S.Ct. 365. Third, the moving party must show the balance of equities tips in its favor. *Id.* at 21, 26, 129 S.Ct. 365. Fourth, the court must consider whether grant or denial of the injunction is in the public interest. The court must give "particular regard" to the public consequences of granting a preliminary injunction. *Id.* at 24, 129 S.Ct. 365; *Real Truth*, 575 F.3d at 347. The Fourth **\*392** Circuit no longer recognizes a "flexible interplay" among these criteria. Instead, each requirement must be fulfilled as articulated. *Real Truth*, 575 F.3d at 347 (quoting *Blackwelder*, 550 F.2d at 196).

## DISCUSSION

### 1. Likelihood of Success on the Merits

Epson alleges iRULU violated the Lanham Act, 15 U.S.C. § 1051, et seq., by falsely advertising the lumen output of its projectors, specifically the BL20. The Lanham Act creates a private right of action for corporate victims of "false or misleading" descriptions or representations. 15 U.S.C. § 1125(a). Section 1125(a)(1)(B) of the Lanham Act provides:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which

\* \* \*

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

§ 1125(a)(1)(B). A plaintiff asserting a false advertising claim under the Lanham Act must establish:

(1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

*Design Res., Inc. v. Leather Indus. of Am.*, 789 F.3d 495, 501 (4th Cir. 2015) (quoting *PBM Prods., Inc. v. Mead Johnson & Co.*, 639 F.3d 111, 120 (4th Cir. 2011)). To establish liability under the false advertising provisions of the Lanham Act, "the contested statement or representation must be either false on its face or, although literally true, likely to mislead and to confuse consumers given the merchandising context." *C.B. Fleet Co. v. SmithKline Beecham Consumer Healthcare, L.P.*, 131 F.3d 430, 434 (4th Cir. 1997).

### i. False or Misleading Description of Fact

The contested lumen advertisements at issue here are false on their face. iRULU proffers evidence supporting an inference it had a factual basis for its representation the BL20 had "luminous flux of more than 2600 lumens." ECF No. 28 at 12. iRULU depends on test reports from Chinese labs showing a "luminous flux" of "3714.568 lm" on one test (ECF No. 28–3 at 6) and "3869.0 lm" on the other (ECF No. 28–4 at 6).[3] It does not, however, **\*393** proffer evidence or argue these tests accurately report a lumen output of 2600 for the BL20.[4] iRULU has ceased advertising its BL20 projector as having 2600 lumens, at least on some websites, but has not provided a lumen rating for this projector. In contrast, Epson offers an affidavit from a consultant at an American independent testing laboratory who measured the lumen output to be much lower, around 80 lumens. ECF No. 9–3, ¶¶ 10, 14.

In sum, Epson has provided evidence the challenged advertising significantly overstates the BL20's lumen output. iRULU offers only evidence of the reasonableness of its prior belief, not of the true lumen rating of the BL20. A factual basis for the advertisement is not what is required by the Lanham Act—actual truth is required. Therefore, Epson has demonstrated falsity in iRULU's advertisements.

### ii. Material Misrepresentation

Brightness is one characteristic customers rely on in determining what projector may best fit their needs. Projectors are often listed and compared on commercial websites by their lumen output. Therefore, statements about lumen output are "likely to influence the purchasing decision" and are material. *See Design Res.,* 789 F.3d at 501.

### iii. Actually Deceives or has Tendency to Deceive

It follows that a false representation the BL20 has a 2600 lumen output actually deceives buyers who purchase a BL20 projector. iRULU does not dispute that a false lumen rating would deceive buyers. As the court has determined the representation to be false, it is one that actually deceives or has a tendency to deceive buyers.

### iv. Interstate Commerce

iRULU placed its advertisements for the BL20 projector on internet websites such as Amazon, eBay.com, Newegg.com, and irulu.com. Consumers from every state in the United States are able to purchase its projectors on any of those websites. Therefore, because the internet is an "instrumentality of interstate commerce," false advertisements on such sites are in interstate commerce. *Verisign, Inc. v. XYZ.com, LLC*, No. 1:14-cv-01749, 2015 WL 7430016, at *4 (E.D. Va. Nov. 20, 2015); *AvePoint, Inc. v. Power Tools, Inc.*, 981 F.Supp.2d 496, 512 (W.D. Va. 2013); *see also Bros. of Wheel M.C. Executive Council, Inc. v. Mollohan*, 909 F.Supp.2d 506, 538 (S.D.W. Va. 2012) ("The defendant's internet activity is a use in commerce"), aff'd 609 Fed.Appx. 149 (4th Cir. 2015).

### v. Injury

The Fourth Circuit has "made clear that the indispensable fifth element of a Lanham Act claim is that the plaintiff has been or is likely to be injured as a result of the [alleged] misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its product." *Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 300 (4th Cir. 2017). Epson has shown injury due to loss of sales and market share. ECF No. 9–2 ¶¶ 16–18 (noting iRULU's market share as 24% since it entered the market, and Epson's loss in sales estimated at approximately $16 million). As discussed more fully in the section below on Irreparable Harm, Epson has met its burden as to this element of the Lanham Act.

Having shown a likelihood of success on the merits on its Lanham Act claim, Epson **\*394** has satisfied the first prong for a preliminary injunction.

### 2. Irreparable Harm

Epson argues it has suffered irreparable harm in the form of lost sales and lost customers as a result of iRULU's false advertisement of a projector with 2600 lumens for a lower price than Epson's 2600 lumen projector. iRULU argues an injunction is not necessary because it has removed the offending advertisements, thus eliminating the risk of future harm. However, in response, Epson has demonstrated iRULU's claims of 2600 lumens are still present on some websites, including iRULU's own website, after iRULU represented to the court the claims had been removed. *See* ECF No. 30–2. Even where removed from product specifications, the BL20 comes up when searching for "2600 lumen projector," apparently as a result of prior advertisements or customer comments. ECF No. 30–6. Therefore, iRULU's arguments of mootness or lack of irreparable injury based on removal of the false advertising fail.

iRULU also argues Epson's loss of projector sales can be compensated by money damages if proven at trial, and therefore an injunction is not appropriate. However, the Fourth Circuit standard clearly allows injunctive relief even if money damages are available, if a remedy at law is inadequate. *PBM Prods.*, 639 F.3d at 127 ("[T]he mere fact that a plaintiff may recover damages does not negate his right to injunctive relief."). Although irreparable harm may be difficult to prove, "a Lanham Act plaintiff who can prove actual lost sales may obtain an injunction even if most of his sales decline is attributable to factors other than the competitor's false advertising." *Id.* at 126–27.

In this case, Epson has shown its sales of consumer projectors have declined since iRULU began selling its BL20 projectors on sites such as Amazon. ECF No. 9–1 at 16; ECF No. 9–2 ¶¶ 16–18. iRULU questions the extent of the correlation between its sales and Epson's monetary loss, but fails to persuade the court it is not responsible for at least part of Epson's decline in sales. Further, money damages would not prevent iRULU from "infecting the marketplace with the same or similar claims in different advertisements in the future." *PBM Prods.*, 639 F.3d at 127. Therefore, Epson is able to show irreparable harm.

### 3. Balance of Equities

The court finds the balance of equities weighs in Epson's favor. iRULU "simply has no equitable interest in perpetuating the false and misleading claims" in its advertisements. [5] *PBM Prods.*, 639 F.3d at 127. In contrast, Epson has an equitable interest in a fair and level playing field regarding specifications for consumer projectors. Epson is unable to compete fairly when iRULU is misleading customers with false lumen claims. *See id.* The balance of equities favors Epson.

### 4. Public Interest

Finally, there is a strong public interest in preventing false or misleading advertisements. *PBM Prods.*, 639 F.3d at 127. Although iRULU contends it has removed the false claims of 2600 lumens, some still exist. Further, iRULU has failed to replace its 2600 lumen claim with an accurate lumen rating. Therefore, confusion likely continues as to the lumen capacity of the BL20 projector and how it compares to other consumer projectors. The public interest is served by advertisements that accurately reflect the product offered **\*395** for sale. This factor also favors granting an injunction.

### RELIEF

Epson asks this court to enter an injunction ordering that iRULU:

1) Immediately cease and desist from engaging in further false or misleading advertising with respect to its products' lumen capacities; [6]

2) Immediately recall all iRULU products that contain unsubstantiated lumens ratings from Amazon and other webpages until such a time as iRULU can substantiate its new proposed lumen claims through appropriate testing; and

3) Immediately send corrective notice to all its retailers and customers disclosing that it made literally false claims regarding its products' lumen capacity.

ECF No. 9. While the court finds a preliminary injunction to be appropriate, not all relief requested is warranted at this time. At this stage, requiring iRULU to cease false advertisements of inflated lumen ratings, along with providing a lumen rating of either "undetermined" or Epson's independent test result of 80 lumens on all advertising is required. However, the court will not require corrective notices to be sent to consumers at this time.

### CONCLUSION

All four requirements for a preliminary injunction are met by Epson. The court, therefore, grants Epson's motion for a preliminary injunction against iRULU as to some, but not all, of the relief requested.

It is hereby **ORDERED**:

Defendant USA111, d/b/a iRULU, is enjoined from advertising its BL20 projector as having 2600 lumens. iRULU, in all existing and new advertisements, may not merely remove the lumen rating altogether. iRULU must list the lumen rating as "undetermined lumens," or list Epson's testing result of 80 lumens for the BL20. iRULU's online advertisements for the BL20 projector shall be revised as set forth herein within fourteen (14) days of entry of this order.

In addition to amending its advertisements, iRULU may also arrange for court-approved testing of its BL20 projectors by an independent laboratory in the United States. If iRULU chooses further testing, it must submit a proposal regarding

the laboratory at which the testing will take place along with testing procedures for the court's approval within twenty-one (21) days of the entry of this order. Once court-approved testing reveals a validated lumen rating, iRULU may petition the court to utilize that rating in its advertisements on an ongoing basis.

**IT IS SO ORDERED**.

**All Citations**

259 F.Supp.3d 387

Footnotes

1    Epson sells products other than portable consumer projectors, and offers its products in brick and mortar stores as well. However, these differences are not relevant to the motion at hand.

2    Epson also seeks injunctive relief under S.C. Code § 39–5–50. However, that section refers to injunctive relief for misappropriation of trade secrets, which is not alleged in the Complaint. Epson did allege a violation of the South Carolina Unfair Trade Practices Act ("SCUPTA"), § 39–5–10, et seq. While SCUPTA provides a private right of action for damages, the injunctive portion of the statute, § 39–5–50, is limited to actions brought by the Attorney General. It is not necessary for the court to rely on the South Carolina statute for the relief requested in this motion.

3    The reports are proffered without any supporting affidavit by a representative of the testing company or indicia of validity. ECF No. 28–3, 28–4. They are, moreover, offered only to show reasonableness of iRULU's original belief. ECF No. 28 at 3 ("[A]s set forth in the two independent test reports ... iRULU had a factual basis for this representation."); ECF No. 28–2 ¶ 13 ("Based on the Test Reports of Shezhen Anbotek and Gold Metal, I thought that the iRULU was safely able to represent in its online listings that the BL–20 was at least a 2600–lumen projector.").

4    No testing shows 2600 lumens; the Chinese tests in fact show more. However, that does not mean the 2600 lumen designation is not false.

5    iRULU's only argument as to balance of equities is that Epson can be compensated through money damages, and therefore the balance of equities does not tip in Epson's favor. The court, having found irreparable harm, finds this claim unpersuasive.

6    Epson appears to argue the lumen ratings of other iRULU projectors may not be accurate. However, the only evidence presented to the court relates to the BL20 projector; therefore, the court's ruling is limited to that model projector.

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | | |
|---|---|---|
| Epson America, Inc. | ) | Civil Action No.  3:18-cv-03134-JMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Curtis International Ltd. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**AFFIDAVIT OF MICHAEL ISGRIG**

I, the undersigned, Michael Isgrig, declare the following:

1.     I am currently the Vice President, North America Consumer Sales and Marketing of Epson America, Inc. ("Epson").  I have served in this position for the past ten years.

2.     Epson sells projectors for home, business, and educational settings.[1]

3.     Digital projectors function similar to other external video devices, such as DVD players or home computers, which receive a signal and then project it onto a screen.

4.     Projectors range in size from that of a cell phone to a larger, permanently-mounted projector intended for a home theatre.  Within a particular projector category (e.g., portable projectors, mounted projectors, etc.) the quality and corresponding price of a specific projector is largely determined by its resolution and brightness.

5.     Projector brightness is measured in lumens; the brighter the projector, the higher the lumen rating, and (all else being equal) the higher the price.

6.     The number of lumens a projector has is one of the most important and immediately recognizable features for consumers, who use this metric to compare the brightness of one projector versus another.

7.     For this reason, manufacturers prominently display and advertise a projector's lumens rating in its packaging and advertising.  In online advertising, manufacturers list the projector's lumens rating in the product description, title, and even in the product name.

---

[1] All of the "projectors" described herein refer to projectors that are purchased by consumers.

8.      Epson has spent millions of dollars and significant time and effort in advertising, promoting, and developing its brand and establishing substantial goodwill in the portable consumer projector market.

9.      In my role as the Vice President, North America Consumer Sales and Marketing, I am responsible for Epson's portfolio of projectors in North America, including product marketing, business planning, pricing, P&L and product roadmap.

10.     A key aspect of my role as Vice President, North America Consumer Sales and Marketing is to monitor the sale of Epson projectors.

11.     Epson obtains consumer purchase data compiled by The NPD Group, Inc. ("NPD" formerly, National Purchase Diary), a leading market research company, to track sales of projectors. NPD provides consumer purchase data regarding the number of projectors sold in the market, not Epson projectors alone.

12.     NPD provides filters that allow subscribers to analyze the data based on country, price, and lumens, among other attributes.

13.     Based on my analysis of the NPD projector market sales data for 2000-3999 lumen projectors priced at $600 or below, I have concluded that Curtis' sale of RCA-branded projectors in the United States reached a high of 61% of the market share of this segment since it entered the market. Its average market share for 2018 was 34% of this same segment. .

14.     Based on a comparison of Epson's projector sales in that same segment prior to Curtis' entrance into the market and its sales today, I estimate that Epson has lost at least $10 million in projector sales in 2018.

15.     Should Curtis be permitted to continue selling projectors, I estimate that Epson will continue to lose more than $10 million in projector sales per year given Curtis' expansion into other brands not specifically disclosed by NPD.

I, Michael Isgrig, declare, under penalty of perjury under the laws of the United States of America, that the above is true and correct.

Michael Isgrig

3/19/19
Date

2

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| Epson America, Inc. | ) | Civil Action No.  3:18-cv-03134-JMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Curtis International Ltd. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**AFFIDAVIT OF KARL LANG**

I, the undersigned, Karl Lang, declare the following:

1.      I am currently the principal of Lumita, Inc., an independent consulting firm and laboratory located in Madison, Wisconsin, which I founded in 1998, specializing in the field of color science and color metrology.  Lumita provides services in three broad categories:

a)  *Display, Projector, and Reflective Color Metrology.*  Lumita facilities include both an N8 grey room for print work and a dedicated black laboratory, outfitted for display and projector metrology.  Lumita carefully follows international standard procedures for display and projector metrology, including, but not limited to IEC, ISO, JBMIA, VESA, ANSI, and the ICDM.  Lumita also follows additional guidelines and best practices outlined by the US National Institutes of Standards and Technology ("NIST").  All measurement instruments are calibrated to NIST traceable references.

b)  *Research and Consulting.*  Lumita provides consulting services for companies that produce color-related products and services. Production methods, competitive analysis, system design, color management work-flow, quality control systems, calibration, color perception, color difference, photometry and color metrology are all areas within my expertise and experience.

c)  *Engineering and Product Development.*  Lumita conducts partial and complete turnkey product development for products that involve color technology.  Software, hardware, user interface, and industrial design can be provided directly.  I also have experience developing color measurement and display hardware, as well as integrated software for

color management and calibration. Products I developed have won numerous awards and industry accolades.

2.      Prior to founding Lumita in 1998, I was Vice President of Color Technology at Radius, Inc. Sunnyvale, CA.  Before joining Radius in 1994, I was Vice President and Co-Founder of Kestrel, Inc. Madison, WI, an early integrator of electronic publishing systems for Fortune 500 companies.

3.      I am a member of:  The Society for Information Display ("SID"); The Society for Imaging Science and Technology ("IS&T"); the Association for Computing Machinery ("ACM"); and the ACM Special Interest Group for Graphics (ACM SIGGRAPH).  From 1994 to 1998 I was a founding and voting representative of the International Color Consortium ("ICC") and was a member of the working group that defined the reference implementation of the ICC workflow and the guidelines for ICC integration with perceptual models.  I am currently the chairman of both the Front Projection working group and the Volume and Color Accuracy working group of the International Committee on Display Metrology.

4.      Based on my professional experience, I have particular expertise in the area of color science and projector color and light metrology.  Specifically, I have personally performed Light Output metrology on over 300 projectors in the last 10 years.  As such, I am qualified to give my opinions regarding the lumens specification and testing of a projector's brightness ("Light Output").

5.      Plaintiff's counsel has engaged me to render expert testimony in the above referenced action.  I am being compensated for my time at a rate of $250 per hour.

6.      I was professionally engaged to test the Light Output of various RCA branded projectors.

7.      On November 12, 2018, I conducted tests on a RPJ129 model projector.  This RPJ129 model projector was purchased in from Walmart.com, an official seller of Curtis products.

8.      On February 16, 2018, I conducted tests on a RCA RPJ116 model projector.

9.      On March 6, 2019, I conducted tests on a RCA RPJ136 model projector.

10.     The purpose of these tests was to ascertain the true Light Output of Curtis' RCA branded projectors.

11.     The general procedure for the tests was as follows.  The projectors were each set up in a lab measuring 10' x 10' x 12', in which the walls, ceiling, and floor were painted with a special matte black to minimize surface reflection.  A precision measurement jig was used to precisely align and position the illuminance heads at the focal plane of the projector.  Each projector was tested in all available "Modes" for ISO 21118 Light Output; only the brightest mode for each projector was used for reporting. Each of the nine measurement locations for each test pattern was sampled *6* times for each trial and averaged to account for any minor fluctuations, no significant fluctuations were noted.  The complete suite of tests was run 3 times

on the brightest mode of each projector. The trial with the highest Light Output was used for the final data analysis of each projector. The Light Output was collected and analyzed by custom software that records all aspects of the experiments and provides a detailed log file. The U.S. National Institute of Standards and Technology in NISTIR 6657 (January 2009) provides detailed guidance on the design, implementation and error reporting for front projection ISO 21118 Light Output testing. The same guidelines are part of the ICDM-IDMS 1.03a (International Committee on Display Metrology - International Display Measurement Standard). Both documents were carefully followed in the design and implementation of the experiment and the apparatus used.

12.    The results showed that the RCA RPJ129 projector had a measured Light Output of 190 lumens for white light using the current worldwide projector measurement standard ISO 21118, or the ANSI standard.

13.    The results showed that the RCA RPJ116 projector had a measured Light Output of 32 lumens for white light using the current worldwide projector measurement standard ISO 21118, or the ANSI standard.

14.    The results showed that the RCA RPJ136 projector had a measured Light Output of 38 lumens for white light using the current worldwide projector measurement standard ISO 21118, or the ANSI standard.

15.    The measurement of Light Output is complex, as there are a number of factors that must be carefully controlled and accounted for. Based on the guidelines detailed in the National Institute of Standards and Technology, NISTIR 6657, I calculated the maximum uncertainty of the final measurement result.

16.    The reported result of the experiment is accurate and was performed with extreme precision, however the total theoretical uncertainty accounting for all factors in the experiment is 8%. Final results are rounded to a reported value of 2 significant digits.

17.    Adding the measurement uncertainty to the measured Light Output value provides a certain upper limit of light output for the projector. For the RCA RPJ129 projector tested, I concluded the projector has a Light Output that does not exceed 200 lumens.

18.    Adding the measurement uncertainty to the measured Light Output value provides a certain upper limit of light output for the projector. For the RCA RPJ116 projector tested, I concluded the projector has a Light Output that does not exceed 35 lumens.

19.    Adding the measurement uncertainty to the measured Light Output value provides a certain upper limit of light output for the projector. For the RCA RPJ136 projector tested, I concluded the projector has a Light Output that does not exceed 40 lumens.

20.    These tests demonstrate that Curtis is significantly misrepresenting the light output of all the projectors tested.

I, Karl Lang, declare, under penalty of perjury under the laws of the United States of America, that the above is true and correct.

_____                    3/21/2019
Karl Lang                                                          Date